IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JENNIFER ALGER and AMBER MYERS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION FILE NO.: |
| | : | 1:15-CV-567-WSD-JCF |
| PRIME RESTAURANT MANAGEMENT, LLC, | : | |
| | : | |
| Defendant. | : | |

## FINAL REPORT AND RECOMMENDATION

Before the Court is Plaintiffs' Motion for Default Judgment.  (Doc. 9).

## Background

Plaintiffs Jennifer Alger and Amber Myers were employed by Defendant Prime Restaurant Management LLC, which operates a number of Titled Kilt franchises ("Defendant").  Defendant hired Plaintiff Alger as a bartender in 2011 and Plaintiff Myers as a bartender and server around June 2012.  (Doc. 1 at ¶¶ 15, 34).   Titled Kilt Restaurants is a themed restaurant which requires female employees to wear certain revealing uniforms as part of its "shtick" to attract customers.  (Doc. 13 at 8)[1].  Maternity versions of these outfits, which include a

---

[1] Document 13 is the transcript of the hearing held before the undersigned and will be cited to where necessary.  Further references to the transcript will be in the form (Tr. __).

button down shirt and a larger skirt, are supposed to be made available if an employee is pregnant.  (Tr. 8).  Both Plaintiffs assert various claims against Defendant surrounding the way they were treated after informing management that they were pregnant.

I. <u>Alger</u>

Before her pregnancy, Defendant scheduled Plaintiff Alger for at least five shifts per week.  (Doc. 1 at ¶ 17).  She worked primarily at the Dunwoody location, which is a higher volume restaurant compared to other Atlanta area locations, and therefore that location generally provides a better opportunity for higher earnings, for at least five shifts per week.  (Doc. 1 at ¶ 17).  Alger also worked at the Alpharetta location when needed, a lower volume restaurant, for up to two shifts per week.  (*Id.* at ¶ 18).  According to Alger, she moved up through the ranks of servers and earned sought-after closing shifts.  (Tr. 6-7).  Alger informed Defendant that she was pregnant around March 2013.  (Doc. 1 ¶ 16).

In March of 2013, Alger had complications with her pregnancy that resulted in her doctor recommending bed rest for approximately a week and a half.  (*Id.* at ¶¶ 22-23).  Alger testified that she had to leave work early because of the issue and go to the Doctor and that when she was told of the bed rest she immediately informed her manager.  (*Id.* at ¶¶ 23-24; Tr. 11).  Alger alleges that Defendant failed to provide her with the proper notices pursuant to the Family Medical Leave

2

Act (FMLA) despite being aware of her condition and the resulting need for leave. (Doc. 1 at ¶ 25).  When she returned, Alger claims that she was no longer given shifts at the preferable Dunwoody location and that her total number of shifts were cut, resulting in her working only three shifts per week at the Alpharetta store.  (*Id.* at ¶ 26).

## II.  Myers

Plaintiff Myers notified Defendant of her pregnancy around March 2013. (*Id.* at ¶ 35).  She claims that, after learning of her pregnancy, her manager became extremely hostile towards her, "often yell[ing] at her and call[ing] her 'stupid' " and "referr[ing] to [her] as a 'walking lawsuit.' "  (Doc. 1 at ¶¶ 45-47).  Myers alleges that on July 26, 2013, she was called into a meeting and issued a final written warning, despite not receiving any written or verbal warnings prior to that date, and advised that she was being place on a thirty-day improvement plan.  (*Id.* at ¶¶ 48-50).  When Myers questioned her manager about the basis for the warning and refused to sign it, her employment was terminated.  (*Id.* at ¶ 51).

## III.  Maternity Uniforms

Titled Kilt has special maternity uniforms that are supposed to be made available to pregnant employees.  Alger claims that she requested one of these uniforms but was told by management that Defendant was out of stock.  (*Id.* at ¶ 19).  Alger states that she repeatedly followed up with Defendant about getting a

maternity uniform between March of 2013 and May of 2013 but was repeatedly told that none had come in stock.  (*Id.* at ¶ 20).  Ultimately, Alger claims that Defendant never provided her with a maternity uniform.  (*Id.* at ¶ 21).  Similarly, Myers claims that she requested a larger skirt for her maternity uniform around April of 2013 but was also told that they were out of stock and Defendant would order more.  (*Id.* at ¶¶ 36-37).  Myers claims that when she again asked for a larger skirt, it was suggested that she could work as a hostess where she could wear slacks, but she declined as that was a lower paying position.  (*Id.* at ¶¶ 38-40).  According to Myers, she eventually contacted the supplier of the uniforms who informed her that Defendant had not placed any order for maternity uniforms and that they had them in stock.  (*Id.* at ¶¶ 42-43).

Plaintiffs filed the Complaint against Prime Restaurant Management, LLC on February 26, 2015 asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and the Family Medical Leave Act ("FMLA").  (Doc. 1).  Plaintiffs then filed a return of service on May 13, 2015 indicating Defendant had been served through its registered agent on May 7, 2015 meaning an answer was due on May 28, 2015.  (*See* Doc. 4).  On June 1, 2015, with no answer from Defendant, Plaintiffs moved for a clerk's entry of default, which was entered on June 2, 2015.  (Doc. 5).  On January 21, 2016, Plaintiffs moved for default judgment against Defendant seeking

damages.  (Doc. 9).  The Court held an evidentiary hearing on March 25, 2016[2] where both Plaintiffs testified and provided factual support for their Complaint. (*See* Doc. 12; Doc. 13 (transcript of hearing)).  Plaintiffs filed a post hearing brief on April 1, 2016 in support of the recovery they seek.  (Doc. 14).

Plaintiffs are seeking back pay, compensatory and punitive damages, liquidated damages as well as attorneys' fees.  Plaintiff Alger seeks a total of $64,500 in back pay, $100,000 in compensatory and punitive damages, and $64,500 in liquidated damages.  (*See* Doc. 14 at 19).  Plaintiff Myers seeks $24,200 in back pay, $100,000 in compensatory and punitive damages, and $24,200 in liquidated damages.  (*See id.*).  Both Plaintiffs also seek prejudgment interest on their back pay (*id.* at 6, 7-8) and together they seek the award of a total of $35,017.50 in attorney's fees and $687.70 in costs (*id.* at 19).  Defendant has not been responsive at any point in these proceedings.

## Discussion

### I.    Motion For Default Judgment

#### A. Liability

---

[2] In reviewing the docket, it does not reflect an entry confirming that the Order (Doc. 11) which set down the default judgment hearing was mailed to the defendant as is customarily done in this District.  Despite this apparent oversight, the undersigned has no reason to believe that the notice of hearing was not mailed to Defendant as the Order directed.  In any event, nothing in Rule 55 requires a particular docket entry be made to memorializing the mailing of notice of hearing to a defendant in default.

Before granting default judgment, the Court "must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Tyco Fire and Sec., LLC v. Alcocer*, 218 Fed. Appx. 860, 863 (11th Cir. 2007). "While 'a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover,' a defaulted defendant is deemed to 'admit[] the plaintiff's well-pleaded allegations of fact.' " *Id.* (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). The Court held a hearing at which Plaintiff testified about her termination. (*See* Doc. 20).

Plaintiffs' claims are brought under Title VII, FLMA, and the ADA. Title VII provides that it is an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). "In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which added new language to Title VII's definitions subsection." *Young v. UPS, Inc.*, 135 S. Ct. 1338, 191 L. Ed. 2d 279, 288 (2015). "The first clause of the 1978 Act specifies that Title VII's 'ter[m]

"because of sex" . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions.' " *Id.* (quoting § 2000e(k)).

Plaintiffs have established facts necessary to prove that they were discriminated based on the fact that they were pregnant—they were denied the proper uniforms, had their shifts cut, were formally written up, denied the ability to take time off, and, ultimately, forced to resign. Plaintiffs testified credibly at the default judgment hearing to establish these violations.

Alger testified that she had complications with her pregnancy, had to take time off, and then her shifts were dramatically reduced. (Tr. 10-12). Further, the shifts she did receive were exclusively at the lower-volume Alpharetta location resulting in a loss of income. (Tr. 14). Alger continued to work, but had to get a few days covered due to further complications with her pregnancy. (Tr. 15-16). After another missed day due to pregnancy issues, Alger ultimately was taken off the schedule and was told she would be informed of her job status after an upcoming managers' meeting. (Tr. 20). In early May 2013, Alger was told that, despite what a great employee she was, the store just could not afford to have taking time off and she was told that maybe she could come back after her baby was born. (Tr. 20). Alger had previously taken time off work to get a breast augmentation which management did not mind at all, but she felt as if she was being punished for the time she needed off as a result of her pregnancy. (Tr. 21).

Alger was not able to gain new employment until August of 2014, meaning she was out of week for approximately 63 weeks.  (Tr.  22-23).

Myers consistently worked as a server or bartender, Monday through Friday at the Alpharetta location beginning in 2011 when she started until the end of her employment.    (Tr. 29).    Myers became pregnant in January of 2013 and immediately informed Defendant.  (Tr. 31).  She planned on working as long as she could and returning as soon as possible after giving birth, a plan of which she made management aware.  (Tr. 31).  Myers had similar difficulty getting the proper pregnancy uniform—she received a shirt, but was told that the larger skirt was out of stock and that she would be informed when it came in, but she never received this confirmation.  (Tr. 33).  Myers testified that she contacted the company that supplied the skirts herself and was informed that there were no current orders from Defendant and that the larger skirts were not in backorder.  (Tr. 33).  In addition, she learned that she could not order one for herself–only management was allowed to place the order.  (Tr. 33).  She informed management of this fact, but still she never received the skirt she needed; eventually, four months after asking for the larger skirt, Myers obtained two skirts from another location by having a customer drive her there.  (Tr. 34).

Before securing the larger skirt, it was suggested that Myers switch to being a hostess so that she could wear pants, but that would mean a significant paycut.

(Tr. 34).  According to Myers, the whole time she was pregnant the workplace was very tense and hostile which reflected a complete shift from conditions before her pregnancy when she worked well with everyone.  (Tr. 36).  After revealing her pregnancy, she was called stupid and told that she was a walking lawsuit.  (Tr. 36). On July 26, 2013, after a shift, despite not being aware of any alleged performance issues, Myers was instructed come to a manager's office where she was informed she was being written up for being "uncoachable," having a bad attitude, for not providing a good customer experience, and for not getting along with co-workers. (Tr. 37).  Myers was not aware of any of these issues previously.  (Tr. 38).  Myers refused to sign the written report, unless she received confirmation of these allegations from her coworkers.  (Tr. 38-39).  She was then told that this was a final written warning, despite the fact that she had never had a written warning or any other form of reprimand in the past.  (Tr. 39).  Myers testified that she asked for a copy of the report but that she was told she could only have one if she signed it.  (Tr. 39).  Myers waited for the general manger to come in to try to sort things out but, she testifies, that when she asked him for a copy of the report, he told her to get out of the store and that she was fired.  (Tr. 39).  Myers testified that she asked for a separation notice but was told she was not getting one and if she did not leave she would be escorted out of the store by police.  (Tr. 40).  She did not receive any explanation for the termination of her employment.  (Tr. 40).  Myers

testified that it was her belief that management did not want her working there anymore due to her pregnancy.

These facts support the allegations made in the Complaint and show that Plaintiffs Alger and Myers were discriminated against and ultimately terminated as a result of their pregnancies.

The Family and Medical Leave Act ensures that eligible employees may take up to twelve weeks of unpaid leave, during which their employment status is protected, because of, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).[3] In *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000), the Eleventh Circuit explained:

> The FMLA recognizes two types of claims for alleged violations of [29 U.S.C. §§ 2611, *et seq.*]: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, *see* 29 U.S.C. § 2615(a)(1) (1999), and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave, *see id.* § 2615(a)(2).

200 F.3d at 1352 (footnotes omitted). "To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which [s]he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266-67 (11th Cir.

---

[3] "A 'serious health condition' denotes 'an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital . . . ; or (B) continuing treatment by a health care provider.' " *Lee v. United States Steel Corp.*, 450 Fed. Appx. 834, 836 (11th Cir. 2012) (unpublished decision) (quoting 29 U.S.C. § 2611(11)).

2008) (citing 29 U.S.C. § 2615(a)(1) and *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001)).  " 'When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances.' "  *Crawford v. City of Tampa*, 464 Fed. Appx. 856, 857 (11th Cir. 2012) (unpublished decision) (quoting 29 C.F.R. § 825.300(b)(1)).  "Consequences for failing to provide notice to its employees 'may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.' "  *Id.* (quoting 29 C.F.R. § 825.300(e)).

"To state an interference claim [under the FMLA], Plaintiff must allege that [Defendant] interfered with, restrained, or denied [him] the ability to exercise a right protected under the FMLA."  *Wright v. Aramark Corp.*, No. 1:13-CV-133 (WLS), 2014 U.S. Dist. LEXIS 14073, at *21 (M.D. Ga. Feb. 5, 2014).  Neither employee was ever made aware of the fact that they had rights with regards to taking time off under the Family Medical Leave Act.  (Tr. 17, 32).  Therefore, Plaintiffs have each set forth a claim for interference under the FMLA.

Under the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, employers are not permitted to discriminate against and must make accommodations for those who have a disability.  To demonstrate a disability a

11

plaintiff must show "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  However, "it is clearly established that pregnancy, *per se* does not constitute a disability under federal law.  *Farrell v. Time Service, Inc.*, 176 F.Supp.2d 1295, 1298 (N.D. Ga. 2001); *see also Mayorga v. Alorica, Inc.*, No. 12-21578-CIV, 2012 WL 3043021, at *5 (S.D. Fla. July 25, 2012 (finding that absent unusual circumstances, a pregnancy is not considered a disability under the ADA).  "However, ADA regulations that provide particularized guidance regarding pregnancy support a distinction between a healthy pregnancy and a pregnancy-related complication or condition that may qualify as an impairment."  *Id.*  Plaintiff Myers has not claimed any complications with her pregnancy.  Plaintiff Alger has stated that she did have a difficult pregnancy and that she was put on bed rest but she did return to work.  Although she saw reduced hours, Plaintiff Alger has not alleged facts, nor testified facts to establish, that her pregnancy-related complications were significant enough to qualify as an impairment.  As a result, neither Plaintiff has alleged facts to show that they qualify for protection under the ADA.

### B. Back Pay

"[A] Title VII plaintiff is entitled to recover for the economic loss due to his or her wrongful termination."  *Price v. Greenman Techs. of Ga.*, No. 5:05-CV-471 (CAR), 2007 WL 2746661, at *3 (M.D.Ga. Sept. 18, 2007) (citing 42 U.S.C. §

2000e-5(g)(1)) (awarding damages on a motion for default judgment in a race-based discrimination case).  An award of back pay is the rule, not the exception.  *Hinston v. Webster Indus.*, No. 2:05cv971, 2006 U.S. Dist. LEXIS 58121, at *14 (M.D. Ala Aug. 17, 2006).  Back pay is calculated by taking employee's rate of pay at discharge and applying it to the amount of time she was unable to secure other, or adequate employment, without taking into account any taxes, unemployment benefits or social security benefits.  *Id.* at 14-15.  Plaintiffs also seek prejudgment interest calculated using the IRS prime interest rate that prevailed during the relevant period.  (Doc. 14 at 6).

Alger was terminated on May 8, 2013.  (*Id.* at 5).  She remained unemployed until August 2014.  (*Id.*).  She testified that she made $1,000 per week meaning she is owed $63,000 in back pay for the time she was out of work.  She also spent three weeks working a reduced schedule that resulted in a loss of $500 a week.  (*Id.* at 6).  Alger testified that she did not stop seeking work at any point, despite her original plan to take time off once she had baby as she could no longer afford to take any more time off than was necessary.  (Tr. 23).  Therefore, Alger is entitled to $64,500 in back pay.  Additionally, she is entitled to pre-judgment statutory interest at the rate set by the Department of Labor which is 3%.  (*See* Doc. 14 at 8).  This means that Plaintiff is entitled to a total award of back pay in the amount of $66,912.12.

13

The undersigned therefore **RECOMMENDS** that Plaintiff Alger be awarded $66,912.12 in back pay.

Myers was terminated on July 26, 2013. (*Id.* at 6). She remained unemployed until January 2, 2014. (*Id.*). When she had her child Myers stopped looking for work for a two week period, therefore, she is entitled to back pay for 21 weeks where she was out of work entirely in the amount of $8,400. (*Id.* at 7). Once she was able to find work in January, 2014, Myers was not able to secure a job that equaled her prior pay and resulted in her losing out on another $15,800 during the time when she was underemployed. (*Id.*). With statutory prejudgment interest, Myers is entitled to $25,620.17 in back pay. (*See id.* at 8).

### C. Compensatory and Punitive Damages

Compensatory and punitive damages are available in a Title VII discrimination case "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1983a(b)(1). In this case, considering that similar mistreatment occurred with respect to two different women at about the same time, that both were told apparent lies about the unavailability of proper maternity uniform, and both received such callous treatment in response to their informing their employer of their pregnancies, compensatory and punitive damages are

14

appropriate.  Overall, Defendant's conduct as established by the testimony of the Plaintiffs in this case plainly reflects "reckless indifference" to Plaintiffs' rights.

Plaintiffs have each requested compensatory and punitive damages in the maximum amount allowable by law.  (Doc. 14 at 8-16).  Title VII caps the amount of compensatory and punitive damages each Plaintiff may recover based on the number of employees employed by Defendant, which in this case is set at $100,000.  *See* 42 U.S.C. § 1981a(b) (3)(B) (capping compensatory and punitive damages at $100,000, per plaintiff, for cases brought against employers with between 100 and 200 employees).  At the hearing, Alger testified that Defendant employed at least 100 to 200 employees in 2013, when the relevant events occurred.  (*See* Tr. 7).  She stated that she made this estimate based upon her knowledge of the number of servers, bartenders, kitchen employees and managers staffed at each location and the number of locations owned by Defendant.  (*Id.*). As a result of this testimony, Plaintiffs are each eligible for a maximum award of $100,000 in compensatory and punitive damages.

Both Plaintiffs testified about the humiliation caused by essentially being terminated as a result of their pregnancy and the strain it placed on their lives, finding themselves unemployed just before giving birth.  (*See* Tr. 20-24, 42-44). Considering the time Plaintiffs went without work, and the resulting significant

impact on their lives, the undersigned **RECOMMENDS** that Plaintiffs each be awarded a total of $100,000 in punitive and compensatory damages.

### D. FMLA Liquidated Damages

Plaintiffs also seek liquidated damages pursuant to the FMLA.  Under the FMLA, a Plaintiff whose rights have been violated are entitled to recover "an additional amount as liquidated damages equal to the sum of the amount described in clause (i) [lost compensation] and the interest."  29 U.S.C. § 2617(a)(iii). "Liquidated damages are awarded presumptively to an employee when an employer violates the FMLA, unless the employer demonstrates that its violation was in good faith and that it had a reasonable basis for believing that its conduct was not in violation of the FMLA."  *Cooper v. Fulton Cnty., Ga.*, 458 F.3d 1282, 1287 (11th Cir. 2006) (citing 29 U.S.C. § 2617(a)(1)(A)(iii)).  Because the Eleventh Circuit has found that liquidated damages are compensatory in nature, and not punitive, Plaintiffs are able to recover both punitive damages and liquidated damages under the FMLA.  *Quitto v. Bay Colony Gold Club, Inc.*, No. 2:06-cv-286, 2007 U.S. Dist. LEXIS 84624, *6 (M.D. Fla. Nov. 15, 2007) (citing *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir. 2000)).

Since Defendant has not responded to this lawsuit it has not established that its actions were in good faith or that it had a reasonable basis for believing its conduct was not in violation of the FMLA.  Therefore, both Plaintiffs are entitled

to liquidated damages equal to the amount of back pay, plus interest, lost as a result of the terminations.

Accordingly, it is **RECOMMENDED** that Plaintiff Alger be awarded $66,912.12 and Plaintiff Myers $25,620.17 in liquidated damages under the FMLA.

## II.   Motion For Attorneys' Fees

Plaintiffs seek attorneys' fees in the amount of $35,017.50 and $687.70 in costs.  (Doc.14 at 18).  Plaintiffs are entitled to recover attorney's fees and costs of litigation as a result of both the Title VII violation and the FMLA violation.  *See* 42 U.S.C. § 2000e-5; 29 U.S.C. § 2617.  In determining what expenses and fees are reasonable, the Court is guided by well-established principles:

> In the Eleventh Circuit, the district court employs the federal lodestar approach to set reasonable fee awards.  *See Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir.1994) (per curiam).   "Under the lodestar formula, a court must first determine the attorney's reasonable hourly rate . . . .   Next, the court takes the reasonable hourly rate and multiplies it by the 'reasonable number of compensable hours.' "  *Schafler v. Fairway Park Condominium Ass'n*, 147 F[]. App'x 113, 114-15 (11th Cir. 2005) (citing *Loranger*, 10 F.3d at 781).   With respect to the reasonable hourly rate, "[t]he applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates[.]"   *Norman v. Hous. Auth.,* 836 F.2d 1292, 1299 (11th Cir.1988) (internal citations omitted).   " 'A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation.' "   *Duckworth v. Whisenant*, 97 F.3d 1393, 1396 (11th Cir.1996) (quoting *Norman*, 836 F.2d at 1299).   In calculating what hours were reasonably spent on the litigation, exclusions for unnecessary or excessive time expended is

17

left to the discretion of the court. *EEOC. v. Enter[]. Leasing Co.*, No. 8:00-cv-2012-T-24EAJ, 2003 U.S. Dist. LEXIS 12852, [] at *3 (M.D. Fla. May 16, 2003) (citing *Norman*, 836 F.2d at 1301). The court should exclude excessive, unnecessary, and redundant hours. *Duckworth*, 97 F.3d at 1397. "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours . . . ," *Norman*, 836 F.2d at 1303, and objections thereto must be equally specific and precise. *Duckworth*, 97 F.3d at 1397; *Norman*, 836 F.2d at 1301.

*Smith v. Psychiatric Solutions, Inc.*, No. 3:08cv3/MCR/EMT, 2008 U.S. Dist. LEXIS 78166, at *19-20 (N.D. Fla. Sept. 12, 2008), *affirmed*, 2009 U.S. App. LEXIS 28140 (11th Cir. Dec. 21, 2009).

It is within the discretion of the Court to award reasonable attorneys' fees and costs to a prevailing party in a Title VII wrongful termination case. *Price*, 2007 WL 2746661 at *3 (citing 42 U.S.C. § 2000e-5(k)). Additionally, Plaintiffs are able to recover attorneys' fees for time devoted to the case while it was at the administrative level. *See Mock v. S. Dakota Brd. Of Regents*, 296 F.Supp.2d 1061, 1064-65 (D.S.D. 2003) (explaining that "time spent on administrative process is recoverable under §2000e-5(k) so long as 'the work product from the administrative proceedings was both useful and of a type ordinary necessary to advance the civil rights litigation to the state it reached before settlement.' " (quoting *Bobbit v. Paramount Cap Mfg., Co.*, 941 F.2d 512, 514 (8th Cir. 1991))). Here, Plaintiffs' claims would have been barred had they not first exhausted their administrative remedies. Therefore, it is appropriate to allow the recovery of fees

for the work completed during the EEOC administrative stage.  *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 52 (1980) (allowing recovery of attorneys' fees for proceedings on discrimination employment complaint at the administrative level). However, the Court still must determine the reasonableness of both the number of hours billed and the hourly rate requested.

In this case, Plaintiffs' counsel had to deal with putting a case together that would apply to two different Plaintiffs, each with her own story, and had to prepare a Complaint containing multiple claims for each Plaintiff.  The undersigned has reviewed the evidence provided by counsel and it provides sufficient detail as to the work that was done.  (*See* Doc. 9-4).

In determining a reasonable number of compensable hours, the Court should consider:

> (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the degree of skill necessary to serve the client properly, (4) the attorney's inability to accept other employment because he accepted the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount of damages involved and the relief or results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the attorney's professional relationship with the client, and (12) awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974).

While the amount of attorneys' fees requested exceeds that awarded in some default judgment cases, the facts of this case suggest that it was a more

complicated factual situation than is present in many default judgment matters. Here, there are two Plaintiffs, each having their own experience at different restaurants involving different individuals.   Plaintiffs, additionally, are each asserting multiple causes of action and seeking default on each of them.  Each one of these different legal theories requires separate work and research to prepare the Complaint, the motion for default judgment, prepare for the default judgment hearing, and prepare the post-hearing brief in support of the damages as requested by the Court.  Based on these factors, the undersigned finds that the number of work hours alleged by Plaintiffs and counsel is reasonable.

Further the various hourly rates for the different levels of employee are reasonable.  The partner who worked on the case billed at $450, but spent very little time on the matter.  It appears the vast majority of the work was done by associates and paralegals billing at much lower rates.  The majority of the fees are from associate Ragan who billed at $250 per hour and paralegals who billed at $125 per hour.

Amanda Farahany, a partner billing at a rate of $450.00 per hour, worked a total of only 1.4 hours on the case for a total of $630.00.  Amelia Ragan, an associate billing at $250.00 per hour, worked a total of 108.25 hours for a total of $27,062.50.  Diana Hower, a paralegal billing at $125.00 per hour, worked 25.2 hours on the case for a total of $3,150.00.  Marilyn Schmitt, also a paralegal billing

at \$125.00 per hour, worked 31.9 hours on the case for a total of \$3,987.50. Beth Barrett and Linda Petmecky, both paralegals billing at \$125.00 per hour, worked 1.1 and 0.4 hours respectively on the case for a total of \$187.50.[4]  A review of the detailed reports provided by Plaintiffs does not indicate any apparent overreaching.

Accordingly, the undersigned finds that these amounts are reasonable and **RECOMMENDS** that Plaintiffs be awarded \$35,017.50 in attorney's fees and \$687.70 in costs.

## Conclusion

The undersigned **RECOMMENDS** that Plaintiffs' motion for default judgment (Doc. 9) be **GRANTED**.  It is further recommended that Plaintiff Alger be awarded the following: back pay, plus interest, in the amount of \$66,912.12; \$100,000 in compensatory and punitive damages under Title VII; and \$66,912.12 in liquidated damages under the FMLA.  It is further recommended that Plaintiff Myers be awarded the following: back pay, plus interest, in the amount of \$25,620.17; \$100,000 in compensatory and punitive damages under Title VII; and \$25,620.17 in liquidated damages under the FMLA.  Additionally, the undersigned recommends that Plaintiffs' request for attorneys' fees be **GRANTED** in the amount of \$35,017.50 in attorney's fees, plus \$687.70 in costs.  When these fees

---

[4] These rates have previously been found reasonable by this Court for attorney Farahany, associates working with her, and her support staff. *See Cain v. Almeco USA, Inc.*, No. 1:12-CV-3296-TWT, 2014 WL 2158413 (N.D. Ga. May 23, 2014) (granting attorney's fees requested with these same hourly rates).

and costs are split between each of the Plaintiffs, a total of $17,508.75 is attributed to each.

Accordingly, the undersigned **RECOMMENDS** that judgment be entered in favor of Plaintiff Alger against Defendant in the amount of $251,332.99 and that judgment be entered in favor of Plaintiff Myers against Defendant in the amount of $168,749.09.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**IT IS SO REPORTED AND RECOMMENDED** this 9th day of June, 2016.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge