IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JENNIFER ALGER and AMBER
MYERS,

                Plaintiffs,

     v.                                 **1:15-cv-567-WSD**

PRIME RESTAURANT
MANAGEMENT, LLC,

                Defendant.

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge J. Clay Fuller's Final

Report and Recommendation [15] ("R&R), recommending that Plaintiffs Jennifer

Alger and Amber Myers' (collectively, "Plaintiffs") Motion for Default

Judgment [9] be granted.

## I.    BACKGROUND

### A.    Facts

#### 1.    Plaintiff Jennifer Alger

Between 2011 and 2013, Defendant Prime Restaurant Management, LLC

("Defendant") operated three (3) Tilted Kilt restaurants in Atlanta and employed

approximately 100-200 employees.  ([13] at 3, 6-7, 28, 30).  These themed

restaurants require female staff to serve as "entertainers and models" and to wear certain revealing uniforms.  ([13] at 7-8).  In 2011, Defendant hired Plaintiff Jennifer Alger ("Alger") to work as a bartender in its Tilted Kilt franchises. (Compl. ¶ 15; [13] at 6).  Alger worked primarily at Defendant's Dunwoody location for at least five (5) shifts per week.  (Compl. ¶ 17).  That location saw higher customer volume, and generated higher staff earnings, than Defendant's other locations.  (Id.).  Alger also worked, as needed, at Defendant's Alpharetta location for up to two (2) shifts per week.  (Compl. ¶ 18).  According to Alger, she "had pretty much [her] pick of the schedule," moved up through the server ranks and earned sought-after closing shifts.  ([13] at 6-7, 15).

In January 2013, Alger became pregnant.  ([13] at 8).  By March 2013, Alger had notified "all of [Defendant's] management and . . . owners" that she was pregnant and had asked Defendant for a "maternity [work] uniform."  (Compl. ¶¶ 16, 19; [13] at 8-9).  Defendant told her that the uniforms were "out of stock" but agreed to order more.  (Compl. ¶ 19).  Alger claims she repeatedly followed up with Defendant and that Defendant repeatedly advised her that no new maternity uniforms had come into stock.  (Compl. ¶ 20).  Defendant never provided her with a maternity uniform.  (Compl. ¶ 21).

In March 2013, Alger began to experience "severe complications" with her pregnancy and, on or around March 17, 2013, after experiencing bleeding at work, she ended her shift early and went to the hospital.  (Compl. ¶ 22; [13] at 10-11). The doctor recommended bed rest for approximately two (2) weeks.  (Compl. ¶¶ 23-24; [13] at 11-12).  Her gynecologist agreed.  ([13] at 11).  Alger immediately informed her manager and took two (2) weeks off work.  (Compl. ¶ 24; [13] at 11-12).  Defendant did not tell Alger that she had a right to medical leave under the Family Medical Leave Act ("FMLA").  (Compl. ¶¶ 24-25; [13] at 12).

In or around early April 2013, when Alger returned to work, she was assigned solely to the Alpharetta location and her shifts were cut to three (3) per week.  (Compl. ¶ 26).  This significantly reduced her income.  (Compl. ¶ 27).  In or around May 2013, Alger took four (4) days off work due to continued complications with her pregnancy.  (Compl. ¶ 28).  Although Defendant "routinely assists other non-pregnant employees in covering shifts," Defendant refused to help Alger find coverage for her shifts.  (Compl. ¶¶ 29-30).  Defendant also did not advise Alger of her right to take medical leave under the FMLA.  ([13] at 17). Alger claims that Defendant previously permitted her to take more than a week off work to get a breast augmentation, "very happ[ily]" arranged cover for her shifts

3

during that period, and gave her the same shifts and several new uniforms when she returned to work.  ([13] at 18).

On May 8, 2013, Defendant terminated her employment, telling her that, although she was "a good employee and great bartender," Defendant "could not build a business if she was going to be out" and "maybe [she could] return after [her] baby is born."  (Compl. ¶¶ 31-33; [13] at 20-21).  Alger understood this to mean that Defendant "had a problem with [her] being pregnant and . . . requiring medical leave."  ([13] at 21).  She testified that she was terminated "because [she] was pregnant, and because [she] needed some medical leave."  ([13] at 27).  Alger did not obtain new employment until August 2014, meaning she was out of week for approximately 63 weeks. ([13] at 22-23).

### 2.   Plaintiff Amber Myers

In June 2011, Defendant hired Plaintiff Amber Myers ("Myers") to work as a bartender and server in its Tilted Kilt franchise.  ([13] at 28).  Myers worked at Defendant's Alpharetta restaurant for approximately five (5) shifts per week.  ([13] at 29).  In January 2013, Myers became pregnant and obtained a maternity uniform from a friend at work.  ([13] at 31-32).  By March 2013, Myers had informed Defendant that she was pregnant and that she intended to take "a brief period" off work after giving birth.  (Compl. ¶ 35; [13] at 31-32).  Defendant did

4

not advise her of her right to medical leave under the FMLA.  ([13] at 31-32).

After learning of Myer's pregnancy, Myer's manager became "extremely hostile"

towards her, "often yell[ing] at her and call[ing] her 'stupid'" and "referr[ing] to

[her] as a 'walking lawsuit.'"  (Compl. ¶¶ 45-47; [13] at 35-37).

In or around April 2013, Myers asked Defendant for a larger skirt for her

maternity uniform.  (Compl. ¶ 36).  Defendant told her that the larger skirts were

"out of stock" and that Defendant would order more and notify Myers when they

arrived.  (Compl. ¶¶ 37, 41).  In April and May 2013, Myers repeatedly reminded

Defendant that she needed a larger maternity uniform.  (Compl. ¶¶ 38, 42).

Defendant told Myers the uniforms were "backordered" and suggested that Myers

could work as a hostess because employees in that position were permitted to wear

slacks.  (Compl. ¶¶ 39, 41).  Myers declined because hostesses were paid less than

employees in her position.  (Compl. ¶ 40).  Myers claims she contacted the

maternity uniform supplier, who told her that the large skirts were in stock and that

Defendant had not placed an order for them.  (Compl. ¶ 43; [13] at 33).  The

supplier informed Myers that she could not order a large skirt for herself and that

any order had to come from Defendant.  ([13] at 33).  Myers informed Defendant

but Defendant never provided her with the larger maternity uniform.  (Compl. ¶ 42;

[13] at 34).

On July 26, 2013, Defendant called Myers into a meeting, provided her with a "final written warning," asked her to sign it, criticized her work performance, and stated that she was being placed on a thirty (30) day "performance improvement plan." (Compl. ¶¶ 48, 50; [13] at 37-39). Defendant claimed to issue the warning because Myers was "uncoachable," had a bad attitude, was not providing a good customer experience, and did not get along with co-workers. ([13] at 37). Myers was not aware of these issues and had not previously received any written or verbal warnings. (Compl. ¶ 49; [13] at 38). Myers testified that she did her job well, had "lots of regulars," worked hard, had high sales, and had a good relationship with her coworkers. ([13] at 36-38).

Myers refused to sign the warning unless Defendant obtained confirmation from Myers' coworkers that the criticisms were valid. ([13] at 38-39). Myers claims she asked for a copy of the warning but was told she could only have one if she signed it. ([13] at 39). The general manager arrived later that evening, refused to give Myers a copy of the warning, and terminated her employment. (Id.). Myers asked for a separation notice but the general manager told her to leave the restaurant and he would "make sure [she] had a police escort" if she came back. ([13] at 40). Although Myers did not receive an explanation for her termination,

she testified that Defendant "didn't want [her] to work any more because [she] was pregnant." ([13] at 41).

B.   Procedural History

On February 26, 2015, Plaintiffs filed their Complaint [1], asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), and the FMLA.  On May 7, 2015, Plaintiffs served [4] their Complaint on Defendant.  Defendant failed to file an answer or responsive motion and, on June 1, 2015, Plaintiffs filed their Motion for Entry of Default against Defendant Prime Restaurant Management, LLC [5].  The Court entered default against Defendant later that day.

On January 21, 2016, Plaintiffs filed their Motion for Default Judgment [9], seeking back pay, liquidated damages, compensatory and punitive damages, attorneys' fees, and litigation costs.  On March 3, 2016, the Magistrate Judge held an evidentiary hearing in which Plaintiffs testified and provided factual support for their claims.  (See [13]).  On April 1, 2016, Plaintiffs filed their Post-Hearing Brief in Support of Damages and Attorney's Fees [14].  In it, Alger seeks $64,500 in back pay, $100,000 in compensatory and punitive damages, and $64,500 in liquidated damages.  Myers seeks $24,200 in back pay, $100,000 in compensatory and punitive damages, and $24,200 in liquidated damages.  Plaintiffs also seek

7

prejudgment interest on their back pay and liquidated damages, $35,017.50 in attorneys' fees, and $687.70 in litigation costs.  Defendant has not entered an appearance or otherwise participated in this case.

On June 9, 2016, the Magistrate Judge issued his R&R, recommending that Plaintiffs' Motion for Default Judgment be granted.  The Magistrate Judge found that Plaintiffs were entitled to relief under Title VII and the FMLA but not under the ADA.  The Magistrate Judge concluded that Alger is entitled to $66,912.12 in back pay and prejudgment interest, $100,000 in compensatory and punitive damages under Title VII, and $66,912.12 in liquidated damages under the FMLA. The Magistrate also concluded that Myers is entitled to $25,620.17 in back pay and prejudgment interest, $100,000 in compensatory and punitive damages under Title VII, and $25,620.17 in liquidated damages under the FMLA.  The Magistrate Judge recommends granting Plaintiffs' request for attorneys' fees and litigation costs in the amount claimed.  The parties did not object to the R&R.

## II.    DISCUSSION

### A.    Legal Standard

#### 1.    Default Judgment

Rule 55(b) of the Federal Rules of Civil Procedure provides that default judgment may be entered against defaulting defendants as follows:

(1) ***By the Clerk***.  If the plaintiff's claim is for a sum certain or a sum that can be made certain  by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2) ***By the Court***.  In all other cases, the party must apply to the court for a default judgment. . . .  If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing.  The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to:
(A) conduct an accounting;
(B) determine the amount of damages;
(C) establish the truth of any allegation by evidence; or
(D) investigate any other matter.

Fed. R. Civ. P. 55(b).

"While a defaulted defendant is deemed to 'admit[ ] the plaintiff's well-pleaded allegations of fact,' he 'is not held to admit facts that are not well-pleaded or to admit conclusions of law.'" Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1278 (11th Cir. 2005) (quoting Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)).  If "the plaintiff has alleged sufficient facts to state a plausible claim for relief," a motion for default judgment is warranted.  Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1246 (11th Cir. 2015); Bruce v. Wal-Mart Stores, Inc., 699 F. Supp. 905, 906 (N.D. Ga. 1988).  "Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim."  Surtain, 789 F.3d at 1245.

9

Ultimately, "[t]he entry of a default judgment is committed to the discretion of the district court," Hamm v. DeKalb Cnty., 774 F.2d 1567, 1576 (11th Cir. 1985), cert. denied, 475 U.S. 1096 (1986)), and "the court, in its discretion, may require some proof of the facts that must be established in order to determine liability," 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2688 (3d ed. Apr. 2016 Update); see id. ("[W]hen it seems advantageous, a court may conduct a hearing to determine whether to enter a judgment by default.").

2.   Report and Recommendation

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  With respect to those findings and recommendations to which objections have not been asserted, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).  The parties did not file objections to the R&R, and the Court thus reviews it for plain error.

10

B.    Analysis

1.    Plaintiffs' Title VII Claims

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), including "because of or on the basis of pregnancy, childbirth, or related medical conditions," 42 U.S.C § 2000e(k).   "[A]n employer is obliged to ignore a woman's pregnancy and to treat the employee as well as it would have if she were not pregnant."  Edwards v. Heatcraft, Inc., No. 7:05-cv-36, 2006 WL 3159945, at *1 (M.D. Ga. Nov. 2, 2006) (quoting Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998) (internal quotation marks omitted)); see 42 U.S.C § 2000e(k) ("[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."). "[P]regnancy discrimination occurs where pregnant employees are treated differently than other employees with regard to, for example, using leave or returning from leave."  Ramjit v. Benco Dental Supply Co., No. 6:12-cv-528, 2013 WL 140238, at *4 (M.D. Fla. Jan. 11, 2013); see Byrd v. Lakeshore Hosp., 30 F.3d

11

1380, 1383-84 (11th Cir. 1994) ("[I]t is a violation of [Title VII] for an employer to deny a pregnant employee the benefits commonly afforded temporarily disabled workers in similar positions, or to discharge a pregnant employee for using those benefits.").

"There are two types of discrimination actionable under Title VII.  The first is 'disparate treatment,' or intentional discrimination. . . .  The second type of discrimination prohibited by Title VII is 'disparate impact.'" Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1313 (11th Cir. 1994).  Plaintiffs here claim intentional pregnancy discrimination.  A plaintiff can show intentional discrimination using circumstantial evidence, Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012), including, in some cases, evidence of "the mere fact of differences in treatment," Armstrong, 33 F.3d at 1313 (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)).  On a motion for default judgment, which is "like a reverse motion to dismiss for failure to state a claim," Surtain, 789 F.3d at 1245, plaintiffs must "must provide enough factual matter (taken as true) to suggest intentional discrimination" but "need not allege specific facts establishing a prima facie case of the employer's liability," Castillo v. Allegro Resort Mktg., 603 F. App'x 913, 917 (11th Cir. 2015) (internal quotation marks omitted);

see Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515 (2002) ("[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . to survive respondent's motion to dismiss.").

The Magistrate Judge found that Defendant discriminated against Alger on the basis of her pregnancy, including because Defendant did not provide her with a maternity uniform, did not help her find coverage for her shifts during pregnancy-related medical leave, and cut her shifts after she returned to work. Defendant "routinely assist[ed] other non-pregnant employees in covering shifts," "very happ[ily]" arranged coverage for Alger when she took more than a week off work to receive a breast augmentation before her pregnancy, and gave Alger the same shifts and several new uniforms when she returned to work after that procedure. (Compl. ¶¶ 29-30; [13] at 18). Defendant also appears to have terminated Alger's employment on the basis of her pregnancy, telling her that, although she was "a good employee and great bartender," Defendant "could not build a business if she was going to be out" on pregnancy-related medical leave and "maybe [she could] return after [her] baby is born." (Compl. ¶¶ 31-33; [13] at 20-21). Alger testified that Defendant "had a problem with [her] being pregnant and . . . requiring medical leave." ([13] at 21). She also testified that she was terminated "because [she] was pregnant, and because [she] needed some medical

leave."  ([13] at 27).

The Magistrate Judge also found that Defendant discriminated against Myers on the basis of her pregnancy, including because Defendant repeatedly refused to provide her with a maternity uniform and became "extremely hostile" towards her after learning of her pregnancy, "often yell[ing] at her and call[ing] her 'stupid'" and "referr[ing] to [her] as a 'walking lawsuit.'"  (Compl. ¶¶ 42, 45-47; see [13] at 36).  Defendant terminated Myers' employment without explanation and without issuing any prior warnings or reprimands.  Myers testified that she was terminated because Defendant "didn't want [her] to work any more because [she] was pregnant."  ([13] at 41).  In light of these facts, bolstered by Plaintiffs' credible testimonies at the evidentiary hearing, the Magistrate Judge determined that Plaintiffs were "discriminated against and ultimately terminated as a result of their pregnancies."  (R&R at 10).  The Court finds no plain error in this finding.

### 2.   Plaintiffs' FMLA Claims

The FMLA provides that an "eligible employee" [1] is entitled to twelve (12) weeks of unpaid leave "[b]ecause of the birth of a son or daughter of the employee

---

[1]    "The term 'eligible employee' means an employee who has been employed—(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of

and in order to care for such son or daughter" or "[b]ecause of a serious health

condition that makes the employee unable to perform the functions of the position

of such employee."  29 U.S.C. § 2612(a)(1)(A), (D).[2]

> The FMLA recognizes two types of claims for alleged violations of
> these provisions:  interference claims, in which employers burden or
> outright deny substantive statutory rights to which their employees are
> entitled, see 29 U.S.C. § 2615(a)(1) (1999),[3] and retaliation claims, in
> which employers discharge employees for exercising their FMLA
> right to leave, see id. § 2615(a)(2).[4]

O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir. 2000).

"To prove FMLA interference, an employee must demonstrate that [s]he was

denied a benefit to which [s]he was entitled under the FMLA."  Martin v. Brevard

Cnty. Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008).

"[W]hen the employer acquires knowledge that an employee's leave may be

for an FMLA-qualifying reason, the employer must notify the employee of the

---

service with such employer during the previous 12–month period."  29 U.S.C.
§ 2611(2)(A).  Plaintiffs here qualify as "eligible employees."
[2]     "A 'serious health condition' denotes 'an illness, injury, impairment, or
physical or mental condition that involves – (A) inpatient care in a hospital . . . ;
or (B) continuing treatment by a health care provider.'"  Lee v. United States Steel
Corp., 450 Fed. App'x. 834, 836 (11th Cir. 2012) (quoting 29 U.S.C. § 2611(11)).
[3]     "It shall be unlawful for any employer to interfere with, restrain, or deny the
exercise of or the attempt to exercise, any right provided under [the FMLA]."
29 U.S.C. § 2615(a)(1).
[4]     "It shall be unlawful for any employer to discharge or in any other manner
discriminate against any individual for opposing any practice made unlawful by
[the FMLA]."  29 U.S.C. § 2615(a)(2).

employee's eligibility to take FMLA leave within five business days, absent

extenuating circumstances." Crawford v. City of Tampa, 464 F. App'x 856, 857

(11th Cir. 2012) (quoting 29 C.F.R. § 825.300(b)(1) (internal quotation marks

omitted)).  "Consequences for failing to provide notice to its employees 'may

constitute an interference with, restraint, or denial of the exercise of an employee's

FMLA rights.'"  Id. (quoting § 825.300(e)).

In March 2013, Alger began to experience "severe complications" with her

pregnancy and, on or around March 17, 2013, after experiencing bleeding at work,

she ended her shift early and went to the hospital.  (Compl. ¶ 22; [13] at 10-11).

The doctor recommended bed rest for approximately two (2) weeks.  (Compl.

¶¶ 23-24; [13] at 11-12).  Her gynecologist agreed.  ([13] at 11).  Alger

immediately informed her manager and took two (2) weeks off work.  ([13]

at 11-12).  Alger later took four (4) more days off work due to continued

complications with her pregnancy.  (Compl. ¶ 28; [13] at 17).  Defendant did not

notify Alger of her right to "FMLA leave."  (Compl. ¶¶ 24-25; [13] at 17).  In

early 2013, Myers informed Defendant that she was pregnant and that she intended

to take "a brief period" off work after giving birth.  (Compl. ¶ 35; [13] at 31-32).

Defendant did not advise her of her right to protected leave under the FMLA.

([13] at 31-32).  The Magistrate Judge determined that "Plaintiffs . . . set forth a

claim for interference under the FMLA" because "[n]either employee was ever made aware of the fact that they had rights with regards to taking time off under the Family Medical Leave Act." (R&R at 11). The Court finds no plain error in this finding.

### 3.   Alger's ADA Claims

The ADA provides that no covered employer shall discriminate against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To state a claim under this provision, a plaintiff must show that: (1) she has a disability, (2) she was a "qualified individual," meaning she could perform the essential functions of her job with or without reasonable accommodations, and (3) she was subjected to unlawful discrimination because of her disability. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255-56 (11th Cir. 2007); Cramer v. State of Fla., 117 F.3d 1258, 1264 (11th Cir. 1997); see 42 U.S.C. § 12111(8).

The ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To state a claim under this provision, plaintiff must show that (1) she "engaged in conduct protected by the ADA," (2) she "was

subjected to an adverse employment action at the time, or after the protected

conduct took place," and (3) Defendant took the adverse employment action

against Plaintiff "because of" her protected conduct.  Collado v. United Parcel

Serv., Co., 419 F.3d 1143, 1158 (11th Cir. 2005) (quoting 3C Fed. Jury Prac. &

Instr. § 172.24 (5th ed.) (internal quotation marks omitted)); see Lewis v. Guy, No.

2:12-cv-2250, 2013 WL 5289957, at *4 (N.D. Ala. Sept. 18, 2013).

Although a "plaintiff asserting a retaliation claim need not succeed in

proving an underlying claim of actual disability," she "must show that [s]he had a

good faith, objectively reasonable belief that [s]he was disabled, and thereby

protected by the ADA."  Robinson v. Hoover Enterprises, Inc., No. 1:03-CV-2565,

2004 WL 2792057, at *3 (N.D. Ga. Oct. 20, 2004); see Amos v. Hertz

Transporting Inc., No. 1:03-cv-1359, 2006 WL 229499, at *11 (N.D. Ga. Jan. 31,

2006) ("A plaintiff claiming retaliation must prove that he engaged in statutorily

protected conduct.  This requires the plaintiff to show that he had a good faith,

objectively reasonable belief that he was disabled, and thereby protected by the

ADA.").

The ADA defines "disability" as "(A) a physical or mental impairment that

substantially limits one or more major life activities . . . ;  (B) "a record of such an

impairment; or (C) being regarded as having such an impairment."  42 U.S.C.

18

§ 12102(1).  "[T]emporary, non-chronic impairments of short duration do not constitute disabilities."  Leone v. All. Foods, Inc., No. 8:14-cv-800, 2015 WL 4879406, at *7 (M.D. Fla. Aug. 14, 2015).  "[S]imply suffering from an impairment does not make a person disabled under the ADA.  Likewise, evidence of a medical diagnosis or medical care, even if long term, does not establish an objectively reasonable belief of disability."  Robinson, 2004 WL 2792057, at *5; see id. ("Certification or diagnosis of a disability for purposes of a parking permit falls short of the exacting standards of qualifying as disabled under the ADA."); Mont-Ros v. City of West Miami, 111 F. Supp. 2d 1338, 1356 (S.D. Fla. 2000) ("A physical condition . . . does not automatically qualify as a 'disability' simply because it is documented in a medical study, diagnosed by a doctor, or capable of being medically treated.").

It is clearly established that pregnancy *per se* does not constitute a disability under federal law."  Farrell v. Time Service, Inc., 178 F. Supp. 2d 1295, 1298 (N.D. Ga. 2001); Walsh v. Food Supply, Inc., 1997 WL 401594, at * 2 (M.D. Fla. Mar. 19, 1997) ("[P]regnancy is not a disability under the ADA.").  However, "a pregnancy-related complication or condition . . . may qualify as an impairment" and "a pregnancy-related impairment that substantially limits a major life activity is a disability" under the ADA.  Mayorga v. Alorica, Inc., No. 12-cv-21578, 2012

19

WL 3043021, at *5 (S.D. Fla. July 25, 2012).

Myers does not assert a claim under the ADA and the Magistrate Judge found that she does not allege any pregnancy-related complications during her employment with Defendant.  (<u>See</u> Compl. ¶¶ 62-93; R&R at 12).  Although Alger was put on bed rest for approximately two (2) weeks, the Magistrate Judge found that she failed to show her pregnancy-related complications constituted a disability under the ADA.  The Magistrate Judge concluded that "neither Plaintiff has alleged facts to show that they qualify for protection under the ADA."  (R&R at 12).  The Court finds no plain error in these findings.

4.    <u>Back Pay under Title VII and the FMLA</u>

"Successful Title VII claimants are presumptively entitled to back pay." <u>Gryder v. Dennin</u>, 427 F. App'x 844, 846 (11th Cir. 2011) (quoting <u>Lathem v. Dep't of Children & Youth Servs.</u>, 172 F.3d 786, 794 (11th Cir. 1999) (internal quotation marks omitted)); <u>see</u> 42 U.S.C. § 2000e-5(g)(1).  Back pay also is required under the FMLA.  29 U.S.C. § 2617(a)(1).  "Back pay is the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained." <u>Akouri v. Florida Dep't of Transp.</u>, 408 F.3d 1338, 1343 (11th Cir. 2005).

"'Unrealistic exactitude is not required' as the back-pay calculation may be based

20

on 'just and reasonable inference' of the missing or imprecise figure." Id. (quoting Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 260 (5th Cir. 1974)). "However, the plaintiff must present some evidence from which the finder of fact can begin a reasonable calculation of a back-pay award." Gryder, 427 F. App'x at 846.

"Title VII requires plaintiffs to mitigate their damages through reasonably diligent efforts to seek employment that is substantially equivalent." Lathem , 172 F.3d at 794. "The burden of proving lack of diligence is on the employer." Gryder, 427 F. App'x at 846 (quoting EEOC v. Massey Yardley Chrysler Plymouth, 117 F.3d 1244, 1251-52 (11th Cir. 1997) (internal quotation marks omitted)). "If the claimant decides to go into a dissimilar line of work, or to accept a demotion, his earnings must be deducted from any eventual backpay award." Ford Motor Co. v. EEOC, 458 U.S. 219, 232 n. 16 (1982).

Alger testified that she earned approximately $1,000 per week during her employment with Defendant. ([13] at 23). In April 2013, after learning of Alger's pregnancy, her pregnancy-related complications, and her need for medical leave, Defendant put Alger on a reduced schedule and transferred her to a slower, lower-volume restaurant. ([14] at 5). As a result, Alger lost approximately $1,500 in income. ([14] at 5). On May 8, 2013, Alger was terminated. ([14] at 5). Although Alger did not stop searching for a new job, she remained unemployed for

approximately sixty-three (63) weeks .  ([14] at 5-6).  The Magistrate Judge found that Alger is entitled to $63,000 in back pay for the time she was out of work, and $1,500 in back pay for the time she worked a reduced schedule.  (R&R at 13).  Applying prejudgment statutory interest at a rate of 3%, the Magistrate Judge concluded that Alger is entitled to a total award of $66,912.12 in back pay.  (R&R at 13-14; [14] at 6).  The Court finds no plain error in these findings.

Myers testified that she earned approximately $400 per week when she worked for Defendant.  ([13] at 29).  Myers was dismissed on July 26, 2013, and remained unemployed until January 2, 2014, twenty-three (23) weeks later.  ([14] at 6).  Because her new job provided her with less income, she earned, between January 2, 2014 and July 12, 2015, approximately $15,800 less than she would have had she not been terminated.  ([14] at 7).  On July 12, 2015, she began a job that provided her with at least the same income she received from Defendant.  ([14] at 7).  Except for a two week period after giving birth, Myers did not stop looking for work after she was dismissed.  ([14] at 6-7).  The Magistrate Judge concluded that, with statutory prejudgment interest, Myers is entitled to $25,620.17 in back pay.  (R&R at 14).  The Court finds no plain error in this finding.

5.    <u>Title VII Compensatory and Punitive Damages</u>

A Title VII plaintiff can recover compensatory damages where the defendant "engaged in unlawful intentional discrimination."  42 U.S.C. § 1981a(a)(1). Compensatory damages include damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses."  42 U.S.C. § 1981a(b)(3).  Compensatory damages also cover "humiliation and emotional distress."  <u>Stallworth v. Shuler</u>, 777 F.2d 1431, 1435 (11th Cir. 1985).

Where a defendant engaged in unlawful discrimination under Title VII, punitive damages also are available if the plaintiff "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); <u>Thomas v. Alabama Home Const.</u>, 271 F. App'x 865, 869 (11th Cir. 2008).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 535 (1999); see <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1280 (11th Cir. 2002) ("Malice or reckless indifference is established by a showing that the employer discriminated in the face

23

of the knowledge that its actions would violate federal law.").  "Malice means 'an intent to harm' and recklessness means 'serious disregard for the consequences of one's actions.'"  U.S. E.E.O.C. v. W&O, Inc., 213 F.3d 600, 611 (11th Cir. 2000) (quoting Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999)).  "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."  Kolstad, 527 U.S. at 536.  "While egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind."  Id. at 535 (internal citations omitted).

"'[P]unitive damages will ordinarily not be assessed against employers with only constructive knowledge' of [Title VII discrimination]; rather, punitive damages may only be considered in cases where the 'discriminating employee was high up the corporate hierarchy' or where 'higher management countenanced or approved his behavior.'"  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002) (quoting Dudley v. Wal–Mart Stores, Inc., 166 F.3d 1317, 1323 (11th Cir. 1999)).  "[E]mployers may assert a good faith defense to vicarious liability for punitive damages where the 'employment decisions of managerial agents are contrary to the employer's 'good-faith efforts to comply with Title

24

VII.'"  Id. (quoting Kolstad, 527 U.S. at 545); see Richardson v. Tricom Pictures &

Prods., Inc., 334 F. Supp. 2d 1303, 1320 (S.D. Fla. 2004) ("[D]efendant employer

bears the burden of asserting and proving good faith compliance with Title VII as a

means to avoid vicarious liability for punitive damages.").

　　　After learning of Myers' pregnancy, Defendant referred to Myers as a

"walking lawsuit," suggesting that Defendant understood that pregnancy

discrimination is unlawful.  (Compl. ¶¶ 45, 47).  See Richardson, 334 F. Supp. 2d

at 1320 ("General knowledge of anti-discrimination law and policy is sufficient to

ascribe awareness that particular discriminatory acts are prohibited by federal law,

as required to support an award of punitive damages in a Title VII case.").

Defendant's managers, and at least one owner, were involved in the discrimination

and Defendant has not asserted any defenses.  (See, e.g., [13] at 8-10, 17, 19-21,

33-34, 37-40).  Given Defendant's conduct in this case, it is not plain error to

conclude that Defendant acted with at least "reckless indifference to [Plaintiffs']

federally protected rights."  42 U.S.C. § 1981a(b)(1); cf. U.S. E.E.O.C., 213 F.3d

at 611 ("A jury may find reckless indifference where the employer does not admit

that it knew that its actions were wrong.").  The Magistrate Judge determined that

Plaintiffs are entitled to compensatory and punitive damages and the Court finds

no plain error in this finding.

25

"[T]he district court has a great deal of discretion in deciding the level of damages to be awarded."  Stallworth, 777 F.2d at 1435.  However, compensatory and punitive damages are capped at $100,000, per plaintiff, in actions brought against employers with "more than 100 and fewer than 201 employees."  42 U.S.C. § 1981a(b)(3)(B).  Alger testified that, between 2011 and 2013, Defendant employed "at least a hundred to two hundred employees."  ([13] at 7; see also [13] at 30).  She based this estimate on the number of Defendant's locations and her knowledge of the servers, bartenders, kitchen employees and managers at each location.  ([13] at 7).  The Magistrate Judge found that Defendant's conduct had a "significant impact on [Plaintiffs'] lives," caused them strain and humiliation, and resulted in lengthy unemployment periods.  (R&R at 15-16).  The Magistrate Judge also found that Defendant mistreated each Plaintiff at approximately the same time and in similar ways, "told apparent lies about the unavailability of proper maternity uniform[s]," and treated Plaintiffs "callous[ly]" as a result of their pregnancies. (R&R at 14).  The Magistrate Judge concluded that Plaintiffs are each entitled to $100,000 in compensatory and punitive damages, as they requested, and the Court finds no plain error in this finding.

6.    FMLA Liquidated Damages

Under the FMLA, plaintiffs are entitled to recover liquidated damages in an amount equal to their back pay and interest.  29 U.S.C. § 2617(a)(1)(A)(iii). "Liquidated damages are awarded presumptively to an employee when an employer violates the FMLA, unless the employer demonstrates that its violation was in good faith and that it had a reasonable basis for believing that its conduct was not in violation of the FMLA."  Cooper v. Fulton Cnty., Ga., 458 F.3d 1282, 1287 (11th Cir. 2006).  Because "liquated damages are compensatory in nature," plaintiffs can recover both punitive and liquidated damages.  Quitto v. Bay Colony Golf Club, Inc., No. 206-cv-286, 2007 WL 4098847, at *2 (M.D. Fla. Nov. 15, 2007); see Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 934 (11th Cir. 2000).

The Magistrate Judge found that Defendant, having failed to participate in this action, has not established that its actions were in good faith or that it had a reasonable basis for believing its conduct was not in violation of the FMLA. (R&R at 16).  The Magistrate Judge concluded that Plaintiffs are each entitled to liquidated damages in an amount equal to their back pay plus interest. (R&R at 16-17).  The Magistrate Judge recommends awarding Alger $66,912.12 and Myers $25,620.17 in liquidated damages.  (R&R at 17).  The Court finds no plain error in these findings and recommendations.

27

7.     <u>Attorneys' Fees and Litigation Costs</u>

Title VII permits, and the FMLA requires, plaintiffs to recover reasonable attorneys' fees and litigation costs.  42 U.S.C. § 2000e-5(k); 29 U.S.C. § 2617(a)(3).  Courts use the federal lodestar method to calculate reasonable fee awards.  "Under the lodestar formula, a court must first determine the attorney's reasonable hourly rate . . . .  Next, the court takes the reasonable hourly rate and multiplies it by the 'reasonable number of compensable hours.'" <u>Schafler v. Fairway Park Condominium Ass'n</u>, 147 Fed. App'x. 113, 114-15 (11th Cir. 2005).

In determining counsel's reasonably hourly rate, the court may consider the following factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the degree of skill necessary to serve the client properly, (4) the attorney's inability to accept other employment because he accepted the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount of damages involved and the relief or results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the attorney's professional relationship with the client, and (12) awards in similar cases.

<u>Id.</u> at 115.  "'A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation.'"  <u>Duckworth v. Whisenant</u>, 97 F.3d 1393, 1396 (11th

28

Cir. 1996) (quoting Norman v. Hous. Auth., 836 F.2d 1292, 1299 (11th Cir. 1988)).  "The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates."  Norman v. Hous. Auth., 836 F.2d 1292, 1299 (11th Cir. 1988).

"'[E]xcessive, redundant or otherwise unnecessary" hours should be excluded from the amount claimed."  Id. at 1301 (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  Courts should "deduct unnecessary or redundant hours and time spent upon 'discrete and unsuccessful claims from the calculations.'"  Duckworth, 97 F.3d at 1397 (quoting Norman, 836 F.2d at 1301-02).  "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours."  Norman, 836 F.2d at 1303.

The Magistrate Judge determined that Plaintiffs' counsel provided sufficiently detailed evidence of their fees and that their hours and rates are reasonable.  The Magistrate Judge found that this case involved a complex factual situation, two (2) plaintiffs with different stories, multiple causes of action, several filings, and an evidentiary hearing.  The Magistrate Judge also found that the "vast majority" of counsel's work was done by associates and paralegals, thus lowering costs, that counsel's "detailed [billing] reports" do not indicate any overreaching, and that counsel's rates previously were found reasonable by this Court.

29

(R&R at 20-21); see Cain v. Almeco USA, Inc., No. 1:12-cv-3296, 2014 WL 2158413 (N.D. Ga. May 23, 2014).  The Magistrate Judge recommends awarding Plaintiffs $35,017.50 in attorneys' fees and $687.70 in litigation costs, as claimed, and the Court finds no plain error in this recommendation.

The Magistrate Judge recommends that judgment be entered in favor of Alger against Defendant in the amount of $251,332.99, and that judgment be entered in favor of Myers against Defendant in the amount of $168,749.09.  The Court finds no plain error in this recommendation.

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge J. Clay Fuller's Final Report and Recommendation [15] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Plaintiffs Jennifer Alger and Amber Myers' Motion for Default Judgment [9] is **GRANTED**.  Judgment is entered in favor of Plaintiff Jennifer Alger against Defendant in the amount of $251,332.99. Judgment also is entered in favor of Plaintiff Amber Myers against Defendant in the amount of $168,749.09.

**SO ORDERED** this 13th day of July, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE